**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Case No. _____

|  |  |
|---|---|
| GIGI JORDAN, | ) |
|         Plaintiff | ) |
|  | ) |
| v. | ) |
|  | ) |
| RAYMOND A. MIRRA, JR., | ) |
|         Defendant | ) |
|  | ) |

**COMPLAINT**

Plaintiff Gigi Jordan ("Jordan") by her undersigned counsel for her Complaint against

Defendant Raymond A. Mirra, Jr. ("Mirra") respectfully states as follows:

I.      <u>INTRODUCTION</u>

1.      This is an action based upon the betrayal of trust placed by Jordan in her former

business partner, Mirra (who was also her husband for a short time before they divorced

amicably) and the lawyer and accountants who were fiduciaries for Jordan, as was Mirra, but

who acted on Mirra's behalf and did his bidding.  The betrayal took place for more than a

decade, from 1997 through 2009.  It involved a massive number of forgeries (approximately one

hundred and twenty (120) of them), as well as transfers of funds, properties and companies

which fraudulently and tortiously concealed from Jordan the true value, amount and extent of her

own holdings.  In 2008, through material misrepresentations and omissions which were

fraudulent and in breach of the fiduciary duties of Mirra and his agents and co-conspirators,

Jordan was fraudulently induced into entering into a Separation and Distribution Agreement and

a host of related agreements (all referred to as the "SDA Agreements") which were to terminate their partnership and divide the joint assets of Jordan and Mirra.  Jordan gave up valuable rights and interests in these inherently unfair agreements.

      2.    The Counts in this Complaint which result from the misconduct of Mirra and his agents and co-conspirators are as follows:

- Count I is a claim based on unsatisfied Promissory Notes executed by Mirra to Jordan in 1997-1998.  Demand was duly made on these Promissory Notes on March 6, 2012.  Said Promissory Notes are now in default or will be by Monday, March 12, 2012.  At the time of the SDA Agreements, Jordan had been fraudulently induced into believing that such Promissory Notes had been satisfied before 2003.  It was not until 2010 and thereafter that she discovered that they had not been satisfied.

- Count II is a claim for an accounting for conduct and dealings which took place primarily in the period from 1998 through 2008 involving individual and joint Jordan/Mirra accounts, businesses, interests and properties and is based upon forgeries, fraud, breaches of fiduciary duty and other misconduct.  The bases for the claims for such an accounting were not discovered until 2010 and thereafter.

- Counts III through VII are claims relating to the fraudulently induced SDA Agreements of 2008 and include claims for: fraud and fraudulent inducement; breaches of fiduciary duties; breach of contract based on breaches of the representations and warranties in the SDA Agreements;

unjust enrichment; and negligent misrepresentation.   The bases for these

claims were not discovered until 2010 and thereafter.

- • Other Counts include Count VIII for piercing the corporate veil of the

companies jointly owned by Jordan and Mirra for which the lawyer and

accountants worked; and Count IX for civil conspiracy between Mirra and

the lawyer and accountants.

3.    Much of the misconduct that has been alleged took place while Jordan was

concentrating almost entirely on the care, diagnosis, and treatment of her son, Jude, who was

born in 2001.  The fraudulent inducement and other misconduct in regard to the SDA

Agreements took place in 2008 at a time of great vulnerability on Jordan's part because of her

concerns about Jude.

4.    Even after signing the SDA Agreements, Jordan continued to place her reliance

on and trust in Mirra and those who worked for him as her fiduciaries for her business and

financial matters.  She did so until December of 2009.  Events occurred thereafter in February of

2010 which have placed Jordan in the hands of the criminal courts, charged with Jude's murder.

The criminal courts will examine the circumstances which led her there and her fate.

5.    It was only later in 2010 and thereafter, that Jordan discovered the bases for the

claims set forth herein.  This action is completely independent from the criminal court

proceedings or from any divorce proceedings which were finalized in 2001.

II.   <u>PARTIES</u>

6.    Plaintiff Jordan is an individual who is a citizen of Nevada and resides in New

York County.  She is currently incarcerated by the New York City Corrections Department at

Rikers Island, East Elmhurst, New York.

7.     Defendant Mirra is an individual who is a citizen of Pennsylvania who resides in Malverne, Pennsylvania.

III.    JURISDICTION AND VENUE

8.     The Court has jurisdiction of this matter based upon diversity of citizenship pursuant to 28 U.S.C. §1332, and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

9.     Mirra has had a long-standing and substantial relationship with New York State through a host of health care and other companies of which he is a principal officer or owner and which do business in New York and in this District.  Through these companies, Mirra transacts business with numerous customers and other business entities in New York and this District on a regular and ongoing basis.  He currently owns residential property in New York in this District and is the Registered Agent with a New York address for a New York corporation of which he is Chairman or Chief Executive and principal owner.

10.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and a substantial part of the property that is the subject of this action is situated in the District.

11.    The events or omissions giving rise to the claims herein occurred during the time period from 1997 through 2009.  The Plaintiff, Jordan resided in the District from 1997 to 1999, and, while a citizen of Nevada, Jordan traveled to and resided in the District frequently for business purposes from 1999 through May 2006, and then resided in the District for much of April 2008 through February 5, 2010.  She is now being held by the New York City Corrections Department at Rikers Island in East Elmhurst, New York.  Prior to her incarceration and her

4

hospitalization immediately prior to such incarceration, while a citizen of Nevada, Jordan was residing in the District.

12.     As set forth below, during the times that the Plaintiff resided in the District she worked in businesses jointly owned by she and Mirra which are the subject of this action; and/or received communications from Mirra, and others on his behalf, about events or omissions that gave rise to substantial aspects of her claims which are the subject of this action.

13.     The Defendant, Mirra currently owns at least one residential property in New York, located at 1020 Warburton Avenue, Unit 7G, Yonkers, Westchester County, New York in the District.

14.     Pridecare, Inc. is a New York corporation with a listed business address at 33 West Main Street, Elmsford, New York in Westchester County in the District.  Mirra is registered in New York as Pridecare, Inc.'s principal officer (as its Chairman or Chief Executive Officer) and its Registered Agent.  As its Registered Agent, Mirra has a New York address at 100-5 Patco Court, Islandia, New York.

15.     Pridecare, Inc. plays a critical role in the claims set forth below.  It is alleged that Jordan, who had an ownership interest in the company, was fraudulently induced by Mirra into surrendering her interest in Pridecare to Mirra.  As such, a substantial part of the property that is the subject of the action is situated in the District.

16.     Hometech Therapies, Inc. is a Delaware corporation doing business and authorized to do business in New York based on a 2009 Application for Authority to the NYS Department of State stating that its office will be in Westchester, New York.  Hometech Therapies, Inc. is another company in which Jordan had an ownership interest which she was, as alleged in this action, fraudulently induced to surrender.  Therefore, Hometech Therapies, Inc.

also constitutes a substantial part of the property that is the subject of the action which is situated in the District.  Mirra had been President of this corporation and, it is alleged on information and belief that he is a principal owner of it.  Mirra was also the Chairman or CEO of two prior New York corporations, one dissolved in 2001 and the other in 1997, which were named Hometech Therapies, Inc.  In fact, Mirra had involvement as a principal owner and officer with several other New York corporations or corporations authorized to do business in New York since 1991 which have been dissolved.

17.     Ambulatory Pharmaceutical Services, Inc. ("APS"), a New Jersey company and the first company in which Mirra and Jordan worked together and which became a lynchpin for their business empire had its offices, within months after its creation, in Westchester County in this District.  The transactions involving the acquisitions of APS are a subject of this action involving the APS/Integrated Health Services, Inc. ("IHS") transaction as well as the U.S. Bioservices Corporation ("U.S. Bioservices")/AmerisouceBergen ("ABC") transaction set forth below for which Jordan seeks an accounting.  The New York State Office of Professions lists Ambulatory Pharmaceutical Services, Inc.'s address as 85 Executive Boulevard, Elmsford, New York in this District.  A registered office is also listed at 1 Odell Plaza, Yonkers, New York in this District.  Therefore, APS is a substantial property which is a subject of this action which is situated in the District.

18.     Another transaction which is the subject of this action was the acquisition of Biomed America, Inc. by Allion Healthcare, Inc. which is a Delaware corporation with its principal executive offices in Melville, New York which took place in March, 2008.

19.     Two New York City Trump Tower condominium units were also conveyed under the fraudulently induced SDA Agreements.  Because of questions concerning other provisions of

the SDA Agreements, there was a default on the mortgage notes for those Trump Tower units, foreclosure proceedings commenced in the Supreme Court, County of New York, and $912,598.76 had to be paid by Jordan to avoid a foreclosure sale.  Thus, the Trump Tower units constituted a substantial part of the property that is the subject of this action which is situated in the District.

20.     Because Mirra, a citizen of Pennsylvania willfully entered into New York by his ownership of property and business activities in New York over an extensive period of time, and because a substantial part of the events and omissions which give rise to the claims set forth herein and a substantial part of the property which is the subject of this action is situated in this District, jurisdiction and venue is proper in this District.

IV.     FACTUAL BACKGROUND

        A.     The 1990s APS/IHS Transaction And The Web Of Deception, Forgery, Control
               And Misappropriation

21.     In 1990, Jordan, then living in New York City, met Mirra and by 1991, they were living together in New York City.

22.     In 1991, Mirra, through a company of his own, and Jordan went into business together in a company named Ambulatory Pharmaceuticals, Inc. ("APS") with an office in Yonkers, New York.

23.     Jordan developed the niche business model for APS, which quickly became an enormously successful company involved in the home healthcare industry, specializing in providing specialized home infusion services.  By 1994, APS was earning approximate net proceeds in excess of $1,000,000 per month and by 1996, APS was approximately netting $2,000,000 to $2,500,000 a month with most of its business in New York.

24.     Because of Jordan's expertise, Mirra granted Jordan an ownership interest in another of his companies, in consideration of Jordan running the office of that company in Yonkers, New York.

25.     Although Jordan developed the sales and ran the business operations, she placed her trust in Mirra to manage and guide her own and their joint business, legal, financial and tax matters.

26.     By 1995 Jordan had exercised an option so that she was the sole shareholder of APS.  In August of 1997, Mirra arranged for the sale of APS to a public company, IHS for $34,250,000 in a transaction in which Jordan was listed as the sole shareholder of APS.

27.     In 1997, Mirra established RAM Capital Group LLC ("RAM Capital") which was jointly owned by Jordan and Mirra, but was effectively dominated by Mirra who dictated its actions.  Mirra further dominated and directed the activities and conduct of RAM Capital's in-house attorney, Joseph A. Troilo, Jr. ("Troilo") and its accountants, Joseph Tropiano ("Tropiano") and Bruce Kolleda ("Kolleda").

28.     As early as 1998 and continuing through December of 2009, Jordan placed her full trust in and relied on Mirra, Troilo, Tropiano and Kolleda in regard to her business, financial and tax matters as her fiduciaries.  Mirra also owed her a fiduciary duty as her business partner.  This became particularly true after the birth of Jordan's son, Jude, as set forth below.  Over such time, Mirra and his employees through RAM Capital and later RAM Realty Holdings LLC ("RAM Realty"), Troilo, Tropiano and Kolleda, were involved in setting up her accounts, paying various bills for her, furnishing information and providing direction to her tax accountants, being involved in all of her legal transactions, maintaining her records, managing her investment properties from a legal and accounting standpoint and handling her investment accounts and

accounting for them.  In this way, Mirra was able to ensnare Jordan in a web of deception, forgery, control and manipulation.

29.      From 1998 until late 2009, various documents were signed with respect to Jordan's financial and business matters.  In a handful of instances, from time to time, Troilo had her execute a specific power of attorney with respect to certain specific documents. Jordan assumed that other documents signed relating to her joint business interests were duly signed by Mirra in his capacity as manger of RAM Capital or other corporate capacity.  Mirra, Troilo, Tropiano and Kolleda were not authorized to sign her name on wire transfers, account openings, mortgages, loans, lines of credit, or otherwise.

30.      In 1998, Mirra and Jordan were no longer romantically involved or living together.  Nevertheless, she continued to place her trust in him and in the RAM Capital lawyer and accountants and to rely on them to manage and guide her business, financial and tax matters then and for years to come as her fiduciaries.  Jordan continued to manage and run the day to day issues related to the profitable management of APS, particularly expanding sales and profitability of the company.

31.      In fact, in 1998, Mirra convinced Jordan that they should marry despite their separation, for financial reasons.

32.      In 1998, Mirra also advised and convinced Jordan that they should create an elaborate asset protection scheme involving offshore trusts in Nevis, the Jersey Channel Islands and the Isle of Mann; and Nevis limited liability companies, including West Highland Company, LLC ("West Highland"), with accounts held in a Swiss bank.  Mirra told Jordan that this was necessary in connection with an Office of Inspector General investigation of HPC America, Inc. ("HPC").

33.     Jordan has never been able to determine whether the amounts which were to be invested by Mirra for her benefit in these offshore entities have been properly accounted for. One obstacle has been that in December of 2009, Mirra both changed the Registered Agent and dissolved the West Highland, LLC.  The dissolution was accomplished through a Unanimous Written Consent on which Jordan's signature as a Member was forged.

34.     Wherefore, Jordan is entitled to a full and complete accounting from Mirra with respect to all offshore accounts in which they had joint interests or which received funds or distributions from any joint interest.

       B.     The 1997-1998 Promissory Notes Due To Jordan From Mirra

35.     At the end of 1997, Jordan had over $18,000,000 in her own personal account at Merrill Lynch & Co., Inc. ("Merrill Lynch") from the APS/IHS transactions.

36.     Merrill Lynch records for the period prior to 1998 have not been made available to Jordan, but in and after 1998, Merrill Lynch's records show numerous transfers out of the accounts of Jordan based on forged wiring instructions or without there being any written wiring instructions at all.  Such transfers were, it is alleged on information and belief, made by, at the behest of, or for the benefit of Mirra.

37.     In 1997 and 1998, Mirra did execute a number of Promissory Notes for amounts due to Jordan for the money taken by him for himself and his company, HPC.  By these Promissory Notes, Mirra promised to pay Jordan as obligor or guarantor the amounts set forth therein at the interest rates and under the terms specified in such Promissory Notes.

38.     It is alleged on information and belief that Mirra is in possession of the original Promissory Notes or has had the originals destroyed.  It is further alleged on information and belief that these Promissory Notes have not been satisfied except that Jordan has found copies of

two "Satisfaction of Promissory Notes" documents, for the Notes of August 29, 1997 and

September 25, 1997, which appear to be executed by her.

        39.     The Promissory Notes, assuming the validity at this time of the two purported

Satisfaction of Promissory Notes, are as follows:

| Note Date | Original Amount | Interest Through 02/29/2012 | Interest Upon Default | Balance Due 02/29/2012 |
|---|---|---|---|---|
| | | | | |
| 08/29/1997 (HPC Note Guaranteed by Mirra) | $2,000,000.00 | | | Purportedly Satisfied |
| | | | | |
| 09/25/1997 (HPC Note Guaranteed by Mirra) | 500,000.00 | | | Purportedly Satisfied |
| | | | | |
| 10/15/1997 (HPC Note Guaranteed by Mirra) | 2,500,000.00 | $7,355,941.46 @ 10% | 10% Penalty of the amount then due | $9,855,941.46 |
| | | | | |
| 03/03/1998 | 100,000.00 | 193,897.85 @ 8% | 10% Penalty of the amount then due | 293,897.85 |
| | | | | |
| 03/03/1998 (HPC Note Guaranteed by Mirra) | 400,000.00 | 775,591.42 @ 8% | 10% Penalty of the amount then due | 1,175,591.42 |
| | | | | |
| 03/25/1998 | 1,000,000.00 | 1,922,845.75 @ 8% | Lesser of 18% per annum, or the maximum interest rate permitted by applicable law | 2,922,845.75 |
| | | | | |
| 05/04/1998 | 1,200,000.00 | 2,281,842.63 @ 8% | N/A | 3,481,842.63 |
| | | | | |
| 05/14/1998 | 1,000,000.00 | 1,895,496.32 @ 8% | Lesser of 18% per annum, or the maximum interest rate permitted by applicable law | 2,895,496.32 |
| | | | | |
| 09/11/1998 | 500,000.00 | 911,512.92 @ 8% | Lesser of 18% | 1,411,512.92 |

| Note Date | Original Amount | Interest Through 02/29/2012 | Interest Upon Default | Balance Due 02/29/2012 |
|---|---|---|---|---|
| | | | | |
| | | | per annum, or the maximum interest rate permitted by applicable law | |
| | | | | |
| 10/01/1998 | 200,000.00 | 362,189.50 @ 8% | N/A | 562,189.50 |
| | | | | |
| Total Due | $6,900,000.00 | $15,699,317.85 (as of 02/29/2012) | | $22,599,317.85 |

40.      Demand was duly made on the Promissory Notes on March 6, 2012.  Said Promissory Notes are now in default or will be by Monday, March 12, 2012.

41.      As set forth below, when the SDA Agreements were being negotiated, it was fraudulently represented to Jordan in California by Mirra in February of 2008, in a telephone call, that all obligations prior to 2003 had been satisfied and resolved.  Such representations were false and fraudulent since these Promissory Notes remained outstanding and unsatisfied.

42.      As set forth below, in the SDA Agreements, Mirra represented to Jordan who was in California in February and March of 2008 orally in the representations and warranties in the SDA Agreements, that all of the assets and liabilities of the parties with respect to their dealings were disclosed as exhibits to the SDA Agreements.  These unsatisfied Promissory Notes were not disclosed and the failure to disclose them constituted a misrepresentation as well as a material breach of the SDA Agreements.

43.      The failure to disclose that these Promissory Notes remained unsatisfied further constituted a breach of fiduciary duties.

44.      Wherefore, Mirra is liable to Jordan on these unsatisfied Promissory Notes in the amount of $6,900,000 in principal due and $15,699,317.85 in interest due through February 29,

2012 and for continuing interest, costs and attorneys' fees.  Six (6) of the eight (8) unsatisfied Promissory Notes further carry increased rates of interest upon default.

      C.    <u>The Birth Of Jude</u>

45.    Following the transaction with IHS, Jordan continued to run the operations of APS in New York with tremendous success.

46.    As set forth above, Mirra and Jordan had not been romantically involved or living together since 1998, although they had married and remained married into 2001.  In 2000 and 2001, with Mirra involved with someone else, Jordan at age 39, very much wanted to have a child.  On July 13, 2001 Jordan gave birth to Jude.  Mirra was not the father.

47.    At the time of Jude's birth, Mirra and Jordan were planning to be amicably divorced, but to remain equal partners in their extremely successful businesses and in future businesses.

48.    Mirra recommended to her that in order to make sure that the biological father, who had surrendered his parental rights, would never be able to claim any parental rights, Mirra would adopt Jude, which he did.  Mirra and Jordan were amicably divorced on November 14, 2001 but continued all of their business dealings together as agreed upon by them.

49.    Thirteen months after he was born, Jude began exhibiting symptoms of what was first diagnosed as autism which was said to be "remarkable and unusual."  He was later diagnosed as suffering from severe catatonia.  From the time Jude's difficulties began until Jude's death in February, 2010, Jordan was increasingly devoted to his care, diagnosis and treatment.  During this time and until December of 2009, she trusted Mirra, Troilo, Tropiano and Kolleda as her fiduciaries to promote and protect her business, financial and tax matters.

D.      The ABC Transaction

50.     In 2002 Mirra was planning another major transaction.  This transaction was to involve the acquisition by ABC of various entities in which Mirra and Jordan and others had interests, including operations in New York County.

51.     In order to position the various entities for an acquisition by ABC or another company, Mirra arranged for a private equity firm to engineer the acquisition of APS, Specialty Pharmacy, Inc. ("Specialty Pharmacy"), another company owed jointly by them, IHS Acquisition XXX, Inc. and other companies by U.S. Bioservices for ultimate acquisition by ABC or another company.

52.     Mirra and the private firm then arranged for the sale of U.S. Bioservices and its subsidiaries, including APS and Specialty Pharmacy and other companies, to be acquired by ABC in a transaction dated as of December 13, 2002 for an amount in excess of $138,000,000 plus further earn out amounts for a total of approximately $160,000,000.

53.     By that time, Mirra and his agents had caused the ownership interests which Jordan and Mirra had held in U.S. Bioservices to be held by their respective LLCs, Hawk Mountain LLC and Conundrum, LLC, created in connection with estate and tax planning done by an attorney hired by Mirra and with whom Jordan never spoke.  Again, it was Mirra and his agents who controlled the distribution of funds from the ABC transaction and with their manipulations and forgeries of the accounts as set forth below, which were discovered in 2010 and thereafter, Jordan has never been able to determine that she and the Hawk Mountain, LLC received the amounts which they should have received from the ABC transaction.

54.     Wherefore, Jordan is entitled to a full and complete accounting from Mirra for all amounts due and received relating to the ABC transaction.

E.       The Deception and Forgeries Leading Up To The SDA Agreements

(1)      Jordan's Continued Reliance And Trust In Mirra And His Co-Conspirators

55.      Following the divorce and the ABC transaction, Mirra and Jordan continued to maintain their partnership and Mirra, in numerous telephone calls represented to Jordan and assured her that the various investments he was making, properties he was purchasing, and business decisions he was making, were being done for both of them.  Mirra also made investments and loans through their jointly owned RAM Capital and conducted real estate purchases and transactions through RAM Realty.  Both RAM Capital and RAM Realty were effectively dominated by Mirra who dictated their actions.  As set forth below, such domination was used by Mirra to commit a fraud and wrong upon Jordan by the forgeries, concealment, fraud, fraudulent inducement, misrepresentations and other misconduct set forth below undertaken by RAM Capital and RAM Realty professionals and other employees on Mirra's behalf and at his bidding.

56.      In a memorandum dated March 26, 2003 from Troilo to Mirra, Troilo states:

Enclosed please find the finalized global structure for your (and Gigi's) financial and property holdings (with the exception of the NY apartment building).  The concept is that Gigi and yourself will have an equal interest in all entities and holdings.

(Emphasis added.)

(2)      Mirra's Transfer Of Funds From Merrill Lynch Joint Accounts And From The Hawk Mountain LLC Account Using Forged Wire Transfers

57.      In April of 2002 a joint account of Mirra and Jordan, 870-12K37, was established at Merrill Lynch to receive funds from the ABC transaction.  The address of the account provided to Merrill Lynch by Mirra and those working for him for the account was 2932 N. Atlantic Boulevard, Fort Lauderdale, Florida.  Jordan had not lived there for four years so was

not aware of all of the transfers made from this account.  From May 2002 through May 2006, there were approximately forty-two (42) wire transfers made to Mirra and various companies as directed by him totaling $18,316,530.92 based upon eighteen (18) forged wire transfers and twenty-four (24) instances for which Merrill Lynch has no record of any written wire transfer authorizations at all.

58.     In January of 2003 an account 870-07004 was established at Merrill Lynch for Hawk Mountain LLC, the limited liability company created for Jordan in 2002 in connection with estate and tax planning.  From January 14, 2003 to December 2006, the address on this account was also 2932 N. Atlantic Boulevard, Fort Lauderdale, Florida where Jordan had not lived for years and was changed in January 2007 to 1974 Sproul Road, Bromall, Pennsylvania, a Mirra business address.  Again, this left Jordan unaware of transfers from this account.  From December 4, 2003 to February 20, 2007, there were thirteen (13) wire transfers out of this account to RAM Capital and other companies which were directed by Mirra and/or persons acting on his behalf or for his benefit which totaled $7,081,932.11 based upon eleven (11) forged wire transfers and two instances for which Merrill Lynch has no record of any written wire transfer authorizations at all.

59.     One example of the use of such a forged wire instruction is the wiring of $1,000,000 to Physician Oncology Network, Inc. ("PONI") on August 9, 2005, whereas the records of the State of Delaware show that there was a voluntary dissolution of PONI, of which Troilo was the Registered Agent, on February 15, 2005, approximately six (6) months earlier.

60.     These forgeries and unauthorized wire transfers were not discovered until 2010 and thereafter.

61.     Wherefore, Jordan is entitled to a full and complete accounting from Mirra of all transfers made by him or his agents out of the individual accounts of Jordan, the Jordan/Mirra joint accounts and the accounts of business interests and properties jointly held by Jordan and Mirra, as well as the loan management accounts for which they were purportedly jointly liable, including but not limited to the following Merrill Lynch accounts: 870-74110, 870-74109, 870-14B97, 870-14H02, 870-12K37, 870-20610, 870-07004, 870-07005, 870-21268, 870-10434 Loan Management Account ("LMA"), 870-07131 LMA, 870-07091 LMA, 870-07092 LMA, 870-07093 LMA, 870-10363, 870-10364 LMA.

(3)     The Forging Of Jordan's Name On Loans, Lines Of Credit And Mortgages

62.     It is alleged on information and belief that Mirra caused the forgery of Jordan's name on mortgages, loans and lines of credit, many of which were notarized by longtime Mirra employees in New Jersey, Pennsylvania, and Florida, when Jordan's credit card records show her to be in New York, California and other states, including but not limited to the following:

a.      A forged signature of Jordan on a Mortgage with the lender National City Bank, dated April 10, 2002, for the property located at 2932 North Atlantic Boulevard, Fort Lauderdale, Florida, with a total principal amount not to exceed $375,000.

b.      A forged signature of Jordan on a Deed of Trust, Instrument # 200401403, with the lender JPMorgan Chase Bank, dated May 28, 2004, for the property located at Route 2, Box 63, Concord, Virginia, with a total amount borrowed of $3,000,000. The borrowers are listed as Raymond A. Mirra, Jr. and Gigi Jordan, joint tenants without the right of survivorship. There was also a forged signature of Jordan on a Second

Home Rider incorporated into the May 28, 2004 Deed of Trust for the property located at Route 2, Box 63, Concord, Virginia.

c.      Two (2) forged signatures of Jordan on an Amendment to Promissory Note with the lender JPMorgan Chase Bank, N.A. (formerly known as JPMorgan Chase Bank), dated November 30, 2004, for the Promissory Note dated as of May 28, 2004, which extended the maturity date of the Note.

d.      A forged signature of Jordan on a Home Equity Line of Credit Deed of Trust, Instrument # 200500757, Reference 050351716000 (which became 429258165495), with the lender JPMorgan Chase Bank, N.A., dated March 29, 2005, for the property located at Route 2, Box 63, Concord, Virginia, with a total maximum principal sum outstanding at any time of $4,000,000.  The grantors of the Deed of Trust are listed as Raymond A. Mirra, Jr., Gigi Jordan, Stone Ridge Enterprises LLC, and RAM Realty Holdings LLC.  There was also a forged signature of Jordan on a Second Home Rider incorporated into the March 29, 2005 Deed of Trust for the property located at Route 2, Box 63, Concord, Virginia.  There was also a forged signature of Jordan on a Document Correction Agreement for Loan/Account No. 050351716000, dated March 29, 2005.  There was also a forged signature of Jordan on an Affiliated Business Arrangement Disclosure Statement, Reference # 050351716000, dated March 29, 2005.

e.      Three (3) forged signatures of Jordan on the June, 2004 account opening documents for the JPMorgan Private Bank Account number Q47178001.

A Prime Advance Loan # 700893657 was associated with this JPMorgan Private Bank Account.  Between June through December 2004 eleven (11) loan advances occurred on Loan # 700893657.  These loan advances total $2,421,944.80.

f.     Three (3) forged signatures of Jordan on Merrill Lynch LMA documents for Pridecare, Inc., LMA Account # 870-07091 with a loan amount requested in the amount of $1,500,000.  The Merrill Lynch LMA Business Account Profile is signed by P. Walsh on June 3, 2005.  Merrill Lynch Account # 870-20610, a joint asset account of both Jordan and Mirra is listed as the Collateral Account for the LMA.

g.     At least one (1) forged signature of Jordan on Merrill Lynch LMA documents for AAA Paving & Grading, LMA Account #870-07092, with a loan amount requested in the amount of $253,000.  The Merrill Lynch LMA Business Account Profile is signed by P. Walsh on June 3, 2005.  Merrill Lynch Account # 870-20610, a joint asset account of both Jordan and Mirra, is listed as the Collateral Account for the LMA.

h.     At least one (1) forged signature of Jordan on Merrill Lynch LMA documents for Stone Ridge LMA Account # 870-07093 with a loan amount requested in the amount of $2,000,000.  The Merrill Lynch LMA Business Account Profile is signed by P. Walsh on June 3, 2005.  Merrill Lynch Account # 870-20610, a joint asset account of both Jordan and Mirra is listed as the Collateral Account for the LMA.

      i.       At least one (1) forged signature of Jordan on Merrill Lynch LMA documents for Ray Mirra and Gigi Jordan LMA Account # 870-10434 with a credit line desired in the amount of $13,000,000.  The Merrill Lynch LMA Retail Account Profile is signed by P. Walsh on July 27, 2005.  Merrill Lynch Account #s  870-12K37, 870-21268, 870-14B97, 870-14H02, 870-74110, and 870-74109, asset accounts of both Jordan and Mirra, are listed as the Collateral Accounts for the LMA.

63.     The forgery regarding the JP Morgan credit raises even further questions.  The Due Diligence documents provided by JP Morgan Chase in 2011 indicate that JP Morgan had examined a version of the Hawk Mountain Operating Agreement provided to them by Mirra which "names Gigi Jordan, as Member and Manager and Bruce Kolleda and Joseph A. Troilo, Jr. as Trustees of Hawk Mountain Trust, also as Managers."  Kolleda and Troilo were never intended to be Managers of The Hawk Mountain LLC, nor has Jordan ever seen any document naming or referring to them as Managers, nor have they or anyone else ever referred to them or claimed that they were Managers of that LLC.  But, it appears that JP Morgan was shown a copy of a Hawk Mountain LLC Operating Agreement by Mirra in which they were named as Managers of the LLC.

64.     These forgeries were not discovered by Jordan until 2010 and thereafter.

65.     Wherefore, Jordan is entitled to a full and complete accounting from Mirra regarding any liability purportedly incurred by Jordan in connection with their joint business interests or properties and any use of the credit of Jordan regarding the same.

(4)      Other Instances Of Forgery And Concealment

66.      In connection with an investment promoted in 2005 by Mirra in Great Point Partners I, L.P. ("GPPI Fund"), Troilo forged Jordan's signature on subscription and other documents and filled out the contact information on GPPI Fund partnership documents by failing to list her email address, cell phone or post office box address, all of which were well known to him, in an apparent effort to ensure that Jordan would not personally receive information from the GPPI Fund.  He had all information, including monthly and annual reports and financial statements, go to himself.

67.      In this way, Mirra, through Troilo, was apparently attempting to conceal from Jordan the fact that he was on the paid Fund Advisory Board of the GPPI Fund and was receiving payments from the GPPI Fund in breach of his fiduciary duties to Jordan.

68.      Wherefore, Jordan is entitled to a full and complete accounting from Mirra of all undisclosed fees and benefits of any kind received from the GPPI Fund.

F.      The Representations Which Were False And Fraudulent, Made In Bad Faith And Made In Breach Of Mirra's Fiduciary Duties In The Negotiations And Inducement Of The SDA Agreements

(1)      The Background Of The SDA Agreements Negotiations

69.      Jordan determined in February of 2008 that she should terminate her business partnership with Mirra and separate their assets.

70.      Jordan hired a San Francisco law firm, Farella Braun & Martel LLP ("Farella Braun") to represent her.  Mark Petersen ("Petersen") of Farella Braun called Troilo in mid-February, 2008, and left a voicemail stating he had been engaged by Jordan who wanted to terminate her partnership with Mirra and separate their assets.

71.     Petersen did not hear back from Troilo but Jordan received a number of highly charged messages from Mirra who insisted that she speak directly with him before there was any contact between their attorneys.

72.     When they did speak some time in mid-February, 2008, Mirra disclosed to Jordan that there was a major acquisition which was imminent whereby Allion Healthcare, Inc. was going to acquire Biomed America, Inc. and its subsidiaries, companies in which Jordan and Mirra had substantial interests.  He told her that any agreement would have to be completed before the Allion/Biomed deal took place in March, 2008 and that there could only be limited due diligence on the part of her attorneys.

73.     On February 20, 2008, Petersen spoke with Troilo who said that unwinding the financial situation was fine with them and they agreed with it.  Troilo also expressed how positive "everyone around here feels" about Gigi.  Troilo said he would get a spreadsheet from Tropiano detailing "everything" and would do a rough draft of a settlement agreement.  Jordan and her attorneys, therefore, reasonably relied and expected that Mirra and his representatives, Troilo and Tropiano, would fully abide by their fiduciary duties of complete and full disclosure of all material facts which might influence her decisions in regard to the SDA Agreements, and their duty of complete good faith and loyalty in making statements which were completely true. With the restricted timetable and restricted due diligence placed on the transaction by Mirra and his co-conspirators, Jordan and her attorneys were, in fact, particularly dependant on Mirra and his agents and co-conspirators, Troilo and Tropiano, as fiduciaries in the SDA Agreements negotiations and transaction.

(2)    <u>The Representations Made During The SDA Agreements Negotiations</u>

74.    On February 21, 2008, on behalf of Mirra, Troilo faxed to Petersen in California a spreadsheet prepared by Tropiano purportedly setting forth the Raymond Mirra & Gigi Jordan Schedule of Net Assets ("2/08 Schedule of Net Assets").  Jordan reasonably relied upon the 2/08 Schedule of Net Assets in agreeing to the SDA Agreements.  Such a schedule contained material misrepresentations and omissions and failed to disclose material facts and documents regarding: the companies in which the funds of Jordan and Mirra, RAM Capital, RAM Realty and the other jointly owned companies had been invested in, the value of the real estate, the mortgages and loans, and the failure to show the loans made by RAM Capital which were its assets, rendering such representations and omissions false, fraudulent, made in bad faith, and sent in breach of the fiduciary duties of Mirra, Troilo and Tropiano, as shown below, causing great economic and financial harm to Jordan.

75.    On February 22, 2008, in a telephone call from Troilo to Petersen in California, Troilo represented, on behalf of Mirra, that the private companies in which Jordan and Mirra had invested, RAM Capital, "ARC" (Advanced Research Corporation), "VasGene" (VasGene Therapeutics, Inc.), "Pridecare" (Pridecare, Inc.) and "Cancer Innovations" were considered to be worth nothing and would only be worth what value Ray Mirra could create in them.  Under the circumstances, Jordan reasonably relied upon such a representation in agreeing to the SDA Agreements.

76.    In an email of February 29, 2008, Troilo sent to Petersen in California with a copy to Tropiano, on behalf of Mirra, a schedule of the private companies in which the funds of Jordan and Mirra had been invested.  Such list contained only the following companies:

> "Schedule of Private Companies
> Advanced Research Corporation, a Florida corporation

23

> Biomed America, Inc., a Delaware corporation and subsidiaries
> Cancer Innovations, Inc., a Delaware corporation
> Pridecare, Inc., a New York corporation
> RAM Capital Group, LLC, a Delaware limited liability company
> RAM Capital II, LLC, a Delaware limited liability company
> RAM Realty Holdings LLC, a Delaware limited liability company
> Stone Ridge Enterprises LLC, a Delaware limited liability company
> Valley Creek Estate, LLC, a Delaware limited liability company
> VasGene Therapeutics, Inc., a California corporation
> West Highland Company, LLC, an Island of Nevis limited liability company"

Under the circumstances, Jordan reasonably relied upon such email in agreeing to the SDA Agreements.

77.     On March 4, 2008, Tropiano, on behalf of Mirra, represented in a telephone call to Brian Donnelly ("Donnelly") in California, another partner at Farella Braun in California, that ARC, Cancer Innovations, Pridecare and VasGene "had no value and were either inactive or shell corporations at this point."  Under the circumstances, Jordan reasonably relied upon such representation in agreeing to the SDA Agreements.

78.     Another representation made by Tropiano in the telephone call to Donnelly in California, on behalf of Mirra, on March 4, 2008, was that the cash payment proposed to be made to Jordan of $4,900,000 was equivalent to the value of her fifteen percent (15%) interest in Biomed.  Under the circumstances, Jordan reasonably relied upon such representation in agreeing to the SDA Agreements.

79.     At some time in the later part of February or early March, Mirra represented to Jordan in a telephone call to her in California that the division of assets in the proposed SDA Agreements related to assets held, invested in and acquired since January of 2003, because as of that time and the completion of the ABC transaction, all prior financial obligations and issues

between them had been satisfied and resolved.  Under the circumstances, Jordan reasonably

relied upon such representation in agreeing to the SDA Agreements.

80.     The SDA Agreements contain representations and warranties by Mirra that "as of

the Effective Date, the Recognized Joint Assets listed on Scheduled 2.1.1 represent all of the

assets in which the parties have a joint interest."  The list of "Private Companies" set forth on

Schedule 2.1.1 in the SDA Agreements is as follows:

> "Private Companies
>
> Corporations
> Advanced Research Corporation, a Florida corporation
> -   shares held by Mirra
> Biomed America, Inc., a Delaware corporation
> -   shares held by Mirra and Jordan
> Cancer Innovations, Inc., a Delaware corporation
> -   shares held by Mirra
> Pridecare, Inc., a New York corporation
> -   shares held by Mirra
> VasGene Therapeutics, Inc., a California corporation
> -   shares held by RAM Capital Group, LLC
>
> Limited Liability Companies
> Greta Company, LLC, an Island of Nevis limited liability company
> -   shelf company; no activity
> RAM Capital Group, LLC, a Delaware limited liability company
> RAM Realty Holdings, LLC, a Delaware limited liability company
> -   Stone Ridge Enterprises LLC, a Delaware limited liability company
>     (disregarded entity)
> Valley Creek Estate, LLC, a Delaware limited liability company
> Sven Company, LLC, an Island of Nevis limited liability company
> West Highland Company, LLC, an Island of Nevis limited liability
> company"

81.     The SDA Agreements contains representations and warranties by Mirra that "as

of the Effective Date, the Recognized Joint Liabilities listed on Schedule 2.1.2 represent all of

the liabilities to which the parties are jointly and/or severally liable."  The list of "Recognized

Joint Liabilities" set forth on Schedule 2.1.2 in the SDA Agreements is as follows:

Schedule 2.1.2
Recognized Joint Liabilities

| Lender | Borrower | Acct Number | Approximate Loan Balance |
|---|---|---|---|
| **Personal Debt:** | | | |
| Merrill Lynch LMA | Mirra and Jordan | 87010434 | $5,318,269 |
| JP Morgan | Mirra | 80150912 | 1,000,000 |
| JP Morgan | Mirra and Jordan | 429258165495 | 4,000,000 |
| | | | |
| **Stone Ridge Enterprises, LLC:** | | | |
| Merrill Lynch (PHH Mortgage Services) | Stone Ridge Enterprises, LLC | 70788336901 | 1,997,000 |
| Merrill Lynch LMA | Stone Ridge Enterprises, LLC | 87007093 | 2,036,749 |
| | | | |
| **Pridecare, Inc.** | | | |
| Merrill Lynch LMA | Pridecare, Inc. | 87007091 | 1,527,437 |
| | | | |
| **Ram Capital Group, LLC** | | | |
| Merrill Lynch LMA | Ram Capital Group, LLC | 87007131 | 263,006 |
| Hawk Mountain, LLC | Ram Capital Group, LLC | N/A | 7,078,772 |
| Hawk Mountain, LLC – Accd Int | Ram Capital Group, LLC | N/A | 1,043,252 |
| Conundrum, LLC | Ram Capital Group, LLC | N/A | 9,638,871 |
| Conundrum, LLC – Accd Int | Ram Capital Group, LLC | N/A | 1,362,803 |
| | | | |
| **Ram Realty Holdings, LLC** | | | |
| Firstrust Bank | Ram Realty Holdings, LLC | 5103725 | 461,472 |
| Firstrust Bank | Ram Realty Holdings, LLC | 5103724 | 461,472 |
| | | | |
| **Valley Creek Estate, LLC** | | | |
| Chase Home Finance | Valley Creek Estate, LLC | 70280420 | 3,150,00 |
| Gigi Jordan | Valley Creek Estate, LLC | N/A | 1,238,000 |

82.     The emails, faxes, other written and oral representations and representations in the SDA Agreements contained material misrepresentations and material omissions and failed to disclose material facts and documents rendering such representations false, fraudulent, and made in bad faith and in breach of the fiduciary duties of Mirra, Troilo, and Tropiano as shown below, causing great economic and financial harm to Jordan.

(3)     The Extensive Loans And 9/06 RAM Capital Notes Spreadsheet; 12/06 Dissolution Plan; And 9/07 Schedule Of Net Assets Never Revealed To Jordan

83.     For reasons never revealed to Jordan, in late 2006, Mirra had become engaged in extraordinary business activities with respect to their joint holdings.

84.     By September 30, 2006, Mirra had caused RAM Capital to make extensive and extraordinary loans to twelve (12) Affiliated and Non-Affiliated Companies.  The loans totaled $13,963,799.17.  These Companies executed Promissory Notes payable to RAM Capital as the Lender/Payee.  Other loans were apparently made by RAM Capital in 2006 as well.

85.     The loans made by RAM Capital were set forth on a RAM Capital Notes 9/30/2006 spreadsheet ("9/06 RAM Capital Notes Spreadsheet") as follows:

| Affiliated Companies: | Borrower | Total |
|---|---|---|
| | Advanced Research Corporation | $1,739,205.00 |
| | Atlas Nursing Services, Inc. | 214,398.39 |
| | Atlas Respiratory Services, Inc. | 2,204,077.00 |
| | Cancer Innovations, Inc. | 656,944.00 |
| | Delta Pharmaceuticals, Inc. | 212,865.00 |
| | Neurology Therapeutics, Inc. | 278,000.00 |
| | Pridecare, Inc. | 2,115,971.48 |
| | RAM Realty Holdings, LLC | 1,388,953.00 |
| | Stone Ridge Enterprises, LLC | 3,766,640.00 |
| | West Highland Company, LLC | 218,600.00 |
| | | |
| Non-Affiliated Companies: | Borrower | Total |
| | Apogenics Healthcare, Inc. | $425,000.00 |
| | Indago HealthCare, Inc. | 451,037.00 |
| | PRN Health Services, Inc. | 217,088.30 |

| | |
|---|---|
| PRN Health Services, Inc. | 75,000.00 |
| Grand Total Affiliated and Non-Affiliated Companies | $13,963,799.17 |

86.     This rush of loans in September of 2006 was not revealed to Jordan by Mirra and his co-conspirators at that time or at any time.  She discovered them some time in 2010 when, to the best of her recollection, she first saw the 9/06 RAM Capital Notes Spreadsheet.

87.     In December of 2006, a RAM Capital Et Al Dissolution Plan ("12/06 Dissolution Plan") was created by Mirra and/or those working for him which included "Valuations" for the entities and properties and the plans to sell them.  Jordan was not made aware of such plan, nor, to the best of her recollection, did she see the 12/06 Dissolution Plan until 2010 or thereafter.

88.     In September of 2007, a Raymond Mirra & Gigi Jordan Schedule of Net Assets As Of September 30, 2007 ("9/07 Schedule of Net Assets") was created by Mirra and/or those who worked for him showing Net Assets including the change in their value from January 31, 2003 to September 30, 2007.  To the best of her recollection, Jordan did not see the 9/07 Schedule of Net Assets until 2010 or thereafter.

(4)     The Misrepresentations And Omissions Concerning The Value Of The Private Companies

89.     The representations by Mirra, and Troilo and Tropiano on his behalf, that the listed private companies were worth "nothing" and were "either inactive or shell companies at this point" were false since these companies were worth a great deal according to the undisclosed documents of Mirra and his co-conspirators and they were, in fact, active companies at that time.

90.     In the undisclosed 12/06 Dissolution Plan, dated only fifteen (15) months previously, and in the undisclosed 9/07 Schedule of Net Assets, dated only six (6) months previously, those purportedly worthless companies were stated to have very high values.

91.     The values of those companies were set forth as follows:

|  | February and March 2008 Representations | 9/07 Schedule of Net Assets | 12/06 Dissolution Plan |
|---|---|---|---|
| ARC | 0 | $3 million | $3-5 million |
| VasGene | 0 | $75 million | $75-250 million (when combined with Delta Pharmaceuticals and Cancer Innovations) |
| Pridecare | 0 | $2.5 million | $2-4 million |
| Cancer Innovations | 0 | $250,000 | See VasGene above |

92.     Mirra, Troilo and Tropiano were obligated as fiduciaries to Jordan to disclose to her and her attorneys at the time of SDA Agreements negotiations, the 9/06 RAM Capital Notes Spreadsheet, the 12/06 Dissolution Plan and the 9/07 Schedule of Net Assets.

93.     The 9/06 RAM Capital Notes Spreadsheet, which was not disclosed at the time of the SDA Agreements negotiations, showed that on September 30, 2006, only eighteen (18) months previously, RAM Capital had advanced: $1,739,205 to ARC; $656,944 to Cancer Innovations; and $2,115,971.48 to Pridecare.  Further undisclosed at the time of the SDA Agreements negotiations was the $2,644,634.10 wired out of the Hawk Mountain LLC account to VasGene on May 22, 2006.  These advances show and that it was highly unlikely that these companies were worthless or were merely inactive or shell companies at the time of the SDA Agreements.

94.     The 12/06 Dissolution Plan and the 9/07 Schedule of Net Assets shows that these were not worthless companies, but were worth a great deal, at least tens of millions of dollars. Further, contrary to the representation made by Tropiano to Donnelly on behalf of Mirra that these companies were inactive or shell companies in 2008, it was discovered in 2010 and thereafter that:

- ARC

There was a written proposal dated November 26, 2007 from United BioSource Corporation ("UBC") to acquire one hundred percent (100%) of the capital stock of ARC and its subsidiary, Biomedical Innovations, Inc. for $5,000,000 in cash, $5,000,000 in the form of UBC stock, and the possibility of payments based on the company's EBITDA results for additional amounts of up to $40,000,000.  Jordan is without information or belief as to whether this acquisition was ever completed, but such an offer made only three and a half months before the SDA Agreements, makes it highly unlikely that ARC was inactive or only a shell company at the time of the SDA Agreements.  Furthermore, from 2005-2008, Biomedical Innovations (the ARC subsidiary) was paid $161,159 by the federal government for medical and surgical instruments, equipment and supplies sold to the Department of Army and Department of Veterans Affairs.

- VasGene

It appears that for two drugs for which VasGene has had patents since 2004, one was released for continued Phase 2 Clinical Trials in August, 2011 and another had completed a Protocol and turned it in to the FDA as of August, 2011 with the Phase 1 Clinical Study to be available soon.  It is alleged on information and belief that the work on such drugs was continuous and that VasGene never was inactive or merely a shell company.

- Pridecare

Records later provided to the SEC by Allion state that it paid Pridecare $1,621,000 in 2008 alone.

95.     These representations made to Petersen by Troilo and to Donnelly by Tropiano concerning the value of ARC, VasGene, Pridecare and Cancer Innovations contained material misrepresentations and material omissions and a failure to disclose material facts and documents, rendering such statements false, fraudulent and made in bad faith and in breach of the fiduciary duties of Mirra, Troilo and Tropiano.  Under the circumstances, it was reasonable for Jordan to rely on them which she did.  She was greatly damaged by such reliance by entering into the SDA Agreements and giving up any rights to these valuable companies and other rights and interests to Mirra.

(5)     The Misrepresentations And Omissions Concerning The Value of RAM Capital

96.     The representation made to Petersen by Troilo that RAM Capital was worthless was also false.  Firstly, RAM Capital held ownership interests in ARC, VasGene and Cancer Innovations.

97.     Furthermore, the undisclosed 9/06 RAM Capital Notes Spreadsheet shows that the representation that RAM Capital was worthless was false since RAM Capital had assets in the form of Promissory Notes due to it in the amount of $13,963,799.17 plus interest.

98.     There was also value in RAM Capital in its ownership of private companies and interests that were not disclosed during the SDA Agreements negotiations as set forth in Section (6) below.

99.     In addition to these hidden private companies set forth below, Mirra and his agents and co-conspirators, failed to disclose, on information and belief, all of the holdings of

31

RAM Capital in public companies.  The 2/08 Schedule of Net Assets lists the value of the holdings of stock in public companies at only $1,455,000.  Mirra did not disclose the public company holdings which were referred to in that Schedule.  It is alleged on information and belief, that RAM Capital, on February 21, 2008, the day that the 2/08 Schedule of Net Assets was faxed, held stock in GammaCan International, Inc., Idera Pharmaceuticals, Inc. and Inovio Pharmaceuticals, Inc. worth a total of $2,786,260.  The amounts held, on information and belief, by RAM Capital in these three companies alone was $1,331,260 more than the entire amount disclosed by Mirra as the RAM Capital holdings in all public companies.

100.     Another asset of RAM Capital's value which was not disclosed to Jordan or her attorneys and which rendered the representation that RAM was worth nothing false, was a contract which RAM Capital had with Allion.  An SEC filing of April 30, 2009 states that RAM Capital had a "transition services agreement" for $10,000 a month with Allion which had an initial term of one year which expired on April 4, 2009 but was continuing thereafter on a month to month basis.  It is not known for how long this contract for transition services went on with Allion paying $120,000 per year to RAM Capital.

101.     Another asset of RAM Capital which was not disclosed to Jordan or her attorneys and which rendered the representation that RAM was worth nothing false, was the assumption by Allion of a promissory note of Biomed of $218,535 dated December 31, 2007 at six percent (6%) interest, which was payable to RAM Capital by Biomed.

102.     On the other hand, the debts of RAM Capital were almost exclusively due to Jordan and Mirra or their respective trusts in equal amounts. Therefore, for the purpose of fairly dividing the value of RAM Capital between Jordan and Mirra, those debts should have cancelled each other out, and the assets of RAM Capital should have been divided.

103.    The statement made to Petersen by Troilo on behalf of Mirra concerning the value of RAM Capital contained material misrepresentations and material omissions and failed to disclose material facts and documents, which were not discovered until 2010 and thereafter, rendering such statement false, fraudulent and made in bad faith and in breach of the fiduciary duties of Mirra and Troilo.  Under the circumstances, it was reasonable for Jordan to rely on them which she did.  She was greatly damaged by such reliance by entering into the SDA Agreements and giving up any rights to RAM Capital and other interests and rights to Mirra.

(6)    The Misrepresentations And Omissions Concerning Private Companies In Which Jordan And Mirra Had An Interest

104.    The list of private companies as set forth in the fax of February 21, 2008, the email of February 29, 2008 and the schedule of companies listed on Schedule 2.1.1 of the SDA Agreements, were false and fraudulent in that they omitted companies and interests in which Jordan and Mirra had invested and which were still in existence as of the effective date of the SDA Agreements on March 12, 2008 or were companies or interests owned or held by RAM Capital which gave value to RAM Capital which was falsely represented to be worthless.  Some of these companies and the interests were set forth on the 9/06 Ram Capital Notes Spreadsheet and the 12/06 Dissolution Plan.  Others were first discovered by scouring corporate records in 2010 and thereafter.

105.    Such omitted companies interests included:

i.    Atlas Nursing Services, Inc.

Listed on the 9/06 Ram Capital Notes Spreadsheet as an Affiliated Company to which Ram Capital loaned a total of $214,398.39 on September 30, 2006.

      ii.     <u>Delta Pharmaceuticals, Inc.</u>

Listed on the 9/06 RAM Capital Notes Spreadsheet as an Affiliated Company to which RAM Capital loaned a total of $212,865 on September 30, 2006.

Also listed on the 12/06 Dissolution Plan along with VasGene and Cancer Innovations as having a value of $75,000,000 to $250,000,000.

      iii.     <u>EyeGene Corporation</u>

EyeGene Corporation was established in Delaware on July 19, 2004 as a domestic corporation with Troilo as Incorporator.  An Affidavit was filed on March 24, 2009, by Mirra as President, ratifying and approving the appointment of Tropiano as Successor Registered Agent.

      iv.     <u>Hometech Therapies, Inc.</u>

This corporation was incorporated in Delaware on March 31, 2004 as a domestic corporation with Troilo as Incorporator.  Mirra was listed as President at least into 2006.  In 2008, there was a change of President and Directors to three people whose address is listed as 501 Elmwood Avenue, Sharon Hill, Pennsylvania, an address used by many Mirra entities.  In a move which is audacious under these circumstances by any standard, Mirra and his agents listed Gigi Jordan as a Director at that same address, although she knew nothing about it.

Hometech Therapies, Inc. filed for doing business in New York on July 13, 2009.

In 1991, a New York corporation named Hometech Therapies, Inc. was created and did business in New York which listed Mirra as Chairman or CEO with an address of 1020 Warburton Avenue, Yonkers, New York.  This company was dissolved by Proclamation in 2001.

In fact, there had even been yet another corporation which was created in New York in 1993 whose Name History includes the name of Hometech Therapies, Inc. which listed Mirra for

service of process and as Chairman or CEO with an address at 1020 Warburton Avenue,

Yonkers, New York.  That corporation was dissolved by Proclamation in 1997.

v.      Jersey Boys Investment

The early investment in an entity which produced the Jersey Boys musical which has, on

information and belief, grossed over $1,000,000 each week since shortly after it opened in 2005

was significant enough for Mirra to have the cast come to RAM Capital's Holiday Party in 2007.

vi.      Neurology Therapeutics, Inc.

Listed on the 9/06 Ram Capital Notes Spreadsheet as an affiliated company to which

RAM Capital loaned $278,000 on September 30, 2006.  Ray Mirra was incorporator.

vii.      U.S. Neurology Corporation

U.S. Neurology Corporation was established in Delaware on February 8, 2006 as a

domestic corporation with Raymond A. Mirra, Jr. as Incorporator.  It was in existence as of

March 12, 2008.  An Affidavit was filed on March 24, 2009, by Raymond A. Mirra, Jr. as

President, ratifying and approving the appointment of Joseph J. Tropiano, Jr. as Successor

Registered Agent.  The corporation is in good standing.

106.    The representations made to Petersen by Troilo and to Donnelly by Tropiano and

in the schedules of private companies sent to Jordan's attorneys which omitted these interests,

constituted material misrepresentations and material omissions and a failure to disclose material

facts and documents, which were first discovered in 2010 and thereafter, rendering such

statements false, fraudulent and made in bad faith and in breach of the fiduciary duties of Mirra,

Troilo and Tropiano.  Under the circumstances set forth above it was reasonable for Jordan to

rely on them which she did.  She was greatly damaged by such reliance by entering into the SDA

Agreements and giving up any rights she had to these interests and other rights and interests to Mirra.

(7)     The Misrepresentation And Omissions Concerning The Payment For Jordan's Biomed Shares As Part Of The SDA Agreement

107.     The representation that the proposed cash payment of $4,900,000 would be equivalent to the value of Jordan's fifteen percent (15%) interest in Biomed was false, fraudulent, made in bad faith and made in breach of Mirra's fiduciary duties.

108.     When Jordan spoke to Mirra late February 2008, Mirra told her that an acquisition of Biomed America and its various subsidiaries was to take place in less than a month and if she wanted to separate their assets including Biomed, it had to be done before then.  In a later telephone conversation in late February or early March, Mirra represented to Jordan that the cash to be paid to her would be the equivalent to the fifteen percent (15%) interest although she would end up with more than that later if she did not cash out for the full value of her fifteen percent (15%) interest at the time of the Biomed/Allion transaction.

109.     Jordan's fifteen percent (15%) interest in Biomed America, if in fact, that was actually the full amount of her interest in it, was worth a great deal more than $4,900,000; and there should have been no risk in getting the full fifteen percent (15%) in cash and stock upon the closing of the Allion/Biomed America transaction.

110.     In fact, it was reported after the Allion/Biomed transaction took place that Allion paid $99,400,000 in cash and stock plus the assumption of debt, reporting the total purchase price of $117,800,000 plus a potential earn out in 2009 if Biomed America achieved certain milestones during the first year after the deal closes.  Jordan's fifteen percent (15%) interest would obviously have been worth more than $4,900,000.

111.    Jordan in signing the SDA Agreements reasonably relied, under the circumstances, on the misrepresentations and omissions made by her fiduciaries, concerning the value of her fifteen percent (15%) in Biomed and the risk involved in the Allion/Biomed America transaction and was induced into signing the SDA Agreements by such misrepresentations and omissions.

112.    These representations made to Jordan by Mirra and to Donnelly by Tropiano on behalf of Mirra concerning the value of the Biomed asset contained material misrepresentations and material omissions and failed to disclose material facts and documents, which were not discovered until 2010 and thereafter, rendering such representations false, fraudulent and made in bad faith and in breach of the fiduciary duties of Mirra and Tropiano.  Under the circumstances set forth above it was reasonable for Jordan to rely on them which she did.  She was greatly damaged by such reliance by entering into the SDA Agreements and giving up her rights to her Biomed shares under the SDA Agreements and other rights and interests to Mirra.

(8)    The Misrepresentations And Omissions Concerning The Values Of The Real Estate As Represented In The 2/08 Schedule Of Net Assets

113.    The representations by Mirra and his co-conspirators as to the total value of the net real estate properties set forth in the 2/08 Schedule of Net Assets were lower by a very significant amount than the values for the same properties set forth in the undisclosed 9/07 Schedule of Net Assets dated only six months previously.

114.    On the undisclosed 9/07 Schedule of Net Assets, the real estate is valued at $44,750,000 with mortgages and loans of $22,231,000 for a net value of $22,519,000.  The 2/08 Schedule of Net Assets, represented that the total net value of the real estate properties was only $15,710,000, which was $6,521,000 less than the valuation of the real estate made only six (6)

months earlier.  It is alleged on information and belief that there was no drastic drop in real estate values to account for this $6,521,000 difference.

115.    These representations made to Jordan and her attorneys as set forth in the 2/08 Schedule of Net Assets contained material misrepresentations and material omissions and failed to disclose material facts and documents, which were not discovered until 2010 and thereafter, rendering such statements false, fraudulent and made in bad faith and in breach of the fiduciary duties of Mirra, Troilo and Tropiano.  Under the circumstances set forth above it was reasonable for Jordan to rely on them which she did.  She was greatly damaged by such reliance by entering into the SDA Agreements and giving up valuable rights and interests to Mirra.

> (9)     The Misrepresentations And Omissions Concerning The Liabilities
>         Represented To Be Joint Liabilities On The 2/08 Schedule Of Net Assets
>         And In The Representations And Warranties Of The SDA Agreements

116.    Mirra and his co-conspirators represented in the 2/08 Schedule of Net Assets that Jordan and Mirra had incurred certain joint liabilities in the form of mortgages, loans and lines of credit.  In the SDA Agreements Mirra represented and warranted that the listed joint liabilities represented all of the liabilities to which the parties are jointly and/or severally liable."

117.    Since Jordan's signature was forged on certain of the purported joint liabilities, the representations that she was liable for such debts were false, fraudulent, made in bad faith and in breach of Mirra and his agents and co-conspirators' fiduciary duties.

118.    As set forth in paragraph 62(a) through (i), Mirra's purported joint liability was based upon forged documents which were not discovered until 2010 and thereafter, as follows:

  a.     Merrill Lynch LMA, 870-10434, for $5,318,260 – see paragraph 62(i);

  b.     JP Morgan, 429258165495, for $4,000,000 – see paragraph 62(d);

  c.     Merrill Lynch LMA, 870-07093, for $2,036,749 – see paragraph 62(h);

        d.      Merrill Lynch LMA, Pridecare, Inc., 870-07091, for $1,527,437 – see

paragraph 62(f).

119.    These representations made in the 2/08 Schedule of Net Assets and in the SDA

Agreements that Jordan was jointly liable with Mirra for these loans, mortgages, and lines of

credit, contained material misrepresentations and material omissions and failed to disclose

material facts and documents, which were not discovered until 2010 and thereafter, rendering

such statements false, fraudulent and made in bad faith and in breach of the fiduciary duties of

Mirra, Troilo and Tropiano.  Under the circumstances set forth above it was reasonable for

Jordan to rely on such representations and representations and warranties, which she did.  She

was greatly damaged by such reliance by entering into the SDA Agreements and giving up

valuable rights and interests to Mirra.

      (10)    <u>The Misrepresentation And Omissions Concerning The 1997-1998
Promissory Notes</u>

120.    The representation made to Jordan by Mirra that all prior financial obligations and

issues between them had been satisfied and resolved as of January 2003 was false and fraudulent

since the 1997-1998 Promissory Notes, as set forth above, had not, it is alleged on information

and belief, been paid and satisfied and were still outstanding and due as of the time of the SDA

Agreements negotiations.

121.    This representation by Mirra to Jordan contained material misrepresentations and

material omissions and failed to disclose material facts and documents, which were not

discovered until 2010 and thereafter, rendering such statements false, fraudulent and made in bad

faith and in breach of the fiduciary duties of Mirra, Troilo and Tropiano.  Under the

circumstances set forth above it was reasonable for Jordan to rely on them which she did.  She

was greatly damaged by such reliance by entering into the SDA Agreements and giving up valuable rights and interests to Mirra thereunder.

G.    The Signing Of The SDA Agreements

122.    In reliance on: the oral and written representations made by Mirra and Troilo and Tropiano on his behalf; the representations and warranties made by Mirra in the SDA Agreements; the duty of absolute good faith and loyalty of Mirra, Troilo and Tropiano as fiduciaries to ensure that such representations were true, complete, and in no way misleading; and the further duty of Mirra, Troilo and Tropiano as fiduciaries to disclose all material facts known to them which would effect the decision of Jordan to enter into the SDA Agreements, Jordan did sign the SDA Agreements, giving up valuable rights and interests to Mirra.  Such representations contained material misrepresentations and material omissions and were false, fraudulent, untrue and misleading.  Such representations failed to disclose material facts and documents and were made in bad faith and in breach of the fiduciary duties of Mirra, Troilo and Tropiano.  The misrepresentations, omissions and failure to disclose were not discovered until 2010 or thereafter.  The SDA Agreements which Jordan was induced to enter into in March of 2008 on account of such representations include the documents set forth on Exhibit "A" attached hereto.

H.    The Continued Reliance And Trust In Mirra And His Co-Conspirators After The Signing Of The SDA Agreements

123.    After the signing of the SDA Agreements, Jordan continued to place her reliance and trust in Mirra and his agents and co-conspirators to manage her financial and business affairs until December of 2009.

124.     In 2009, Jordan grew concerned about Mirra's conduct and was advised by counsel that she should terminate the ongoing management of her business, financial and tax matters by Mirra, Tropiano, Troilo and Kolleda.

125.     In a response to a communication from Jordan's attorney concerning such termination in December of 2009, Troilo characterized what was done by Mirra, himself, Tropiano and Kolleda for Jordan as follows:

> "hi gay ... what we do for gigi is extensive … we handle all of her personal and business affairs … do all her account set-up, bill paying…coordination with her cpa … involved in all legal transactions, interface with her professionals … maintain all of her records, etc. … manage or assist in managing her investment properties from a legal and accounting standpoint … handle her investment accounts and accounting for same … i hope you have the resources lined up to handle all of these aspects…."

I.     The Tragedy Of February 5, 2010

126.     On February 5, 2010, a tragedy occurred which resulted in the death of Jude and in Jordan being charged with murder.  She is currently awaiting trial.

127.     Although Jordan did have great fears and concerns about Mirra in late 2009 and early 2010, including concerns about his business activities and his handling of their joint business interests, particularly their overseas business interests, the fraud, fraudulent inducement, breaches of fiduciary duty and other misconduct as set forth above, was not discovered until later in 2010 and thereafter.

## COUNT I
## Claim For Breach Of Contract On Promissory Notes

128.     Jordan repeats and realleges the allegations of paragraphs 1 through 127 as if fully stated herein.

129.     As set forth above, Mirra as obligor and guarantor promised to Jordan to pay the amounts set forth above at the specified interest rates in the 1997-1998 Promissory Notes as aforesaid.

130.     Demand has been duly made on said Promissory Notes which are in default or will be in default as of March 12, 2012.  Accordingly, Mirra has breached the express terms thereof.

131.     The conduct of Mirra as set forth herein caused Jordan to sustain damages and was morally culpable and egregious and gross and wanton.

132.     Wherefore, Jordan demands a judgment on these Notes against Mirra on the Promissory Notes in the amount of $22,599,317.85 including interest through February 29, 2012, plus further interest, costs and attorneys' fees.

## COUNT II
### Claim For An Accounting By Mirra

133.     Jordan repeats and realleges the allegations of paragraphs 1 through 132 as if fully stated herein.

134.     As set forth above, Mirra and his agents and co-conspirators had a fiduciary relationship with Jordan and the duty to account to her for the business, financial, legal and tax matters they were managing for her individually and for the businesses, interests and properties she held or owned jointly with Mirra.  Jordan has no adequate remedy at law with respect to such an accounting.

135.     Wherefore, in the absence of a legal remedy with respect to such an accounting, Jordan demands and is entitled to a full and complete accounting from Mirra concerning and relating to: all offshore accounts in which they had a joint interest or which received funds or distributions from any joint interest; the distribution of all amounts received relating to the ABC

transaction; the transfers out of the individual accounts of Jordan, the Jordan/Mirra joint accounts, the accounts of and relating to businesses interests and properties jointly held or owned by Jordan and Mirra, as well as the loan management accounts for which Jordan and Mirra were purportedly liable; any liability purportedly incurred by Jordan in connection with any Jordan/Mirra joint businesses, interests or properties and any use of the credit of Jordan regarding the same; and all undisclosed fees received by Mirra from the GPPI Fund.

**COUNT III**
**Fraud And Fraudulent Inducement Regarding The SDA Agreements**

136. Jordan repeats and realleges the allegations of paragraphs 1 through 135 as if fully stated herein.

137. As set forth above, Mirra and his agents and co-conspirators misrepresented material facts and made material omissions in negotiating and inducing Jordan to enter into the SDA Agreements.

138. These facts and omissions were known by Mirra and his agents and co-conspirators to be false and they intended them to be relied on by Jordan so as to induce her to enter into the SDA.

139. Jordan reasonably relied upon such false representations and omissions.

140. Jordan suffered substantial damages as a result of her reliance by entering into the SDA Agreements and by giving up valuable rights and conveying valuable interests to Mirra thereunder.

141. The conduct of Mirra as set forth herein was morally culpable and egregious and gross and wanton.

142. Wherefore, Jordan demands a judgment: nullifying the SDA Agreements; and creating a constructive trust for all or some of the interests conveyed to Mirra thereunder; as an

alternative to such a constructive trust, an order requiring the payment to Jordan from Mirra of such amounts as justice requires to compensate her for being fraudulently induced into the inherently unfair SDA Agreements by him and his agents and co-conspirators.

**COUNT IV**
**Claim For Breach Of Fiduciary Duties**

143.    Jordan repeats and realleges the allegations of paragraphs 1 through 142 as if fully stated herein.

144.    As set forth herein, at all times material hereto, Mirra acted as a fiduciary and owed a fiduciary duty to Jordan as her business partner in the numerous business entities and transactions described herein and Mirra, Troilo, Tropiano and Kolleda acted as fiduciaries and owed a fiduciary duty to Jordan with respect to the management of her individual business, financial, legal and tax matters and her jointly held businesses, interests and properties with Mirra.

145.    The fraud and fraudulent inducement set forth in Count III above further constituted breaches of the fiduciary duty owed by Mirra and his agents and co-conspirators to Jordan.

146.    Mirra and his agents and co-conspirators further perpetrated forgeries, concealment, and a failure to disclose material documents to Jordan as to the amount and extent of her joint holdings with Mirra leading up to and during the SDA Agreements negotiations. Such conduct breached the duty of good faith and loyalty and a breach of fiduciary duties owed to Jordan by Mirra and his agents and co-conspirators which required them to act toward her with the "punctilio to honor the most sensitive."

147.    Such unfair dealing by Mirra and his agents and co-conspirators caused Jordan to enter into the SDA Agreements, which were inherently unfair agreements, under which she gave up valuable rights and conveyed valuable interests to Mirra.

148.    The conduct of Mirra as set forth herein caused Jordan to sustain damages and was morally culpable and egregious and gross and wanton.

149.    Wherefore, on account of such breaches of fiduciary duties, Jordan demands a judgment: nullifying the SDA Agreements; and creating a constructive trust for all or some of the interests conveyed to Mirra thereunder; or as an alternative to such a constructive trust, an order requiring the payment to Jordan from Mirra of such amounts as justice requires to compensate her for entering into the inherently unfair SDA Agreements as a result of the breaches of fiduciary duties by Mirra and his agents and co-conspirators.

**COUNT V**
**Claim For Breach Of Contract On Account Of**
**Mirra's Breach Of Representations And Warranties**

150.    Jordan repeats and realleges the allegations of paragraphs 1 through 149 as if fully stated herein.

151.    As set forth herein, Jordan entered into the SDA Agreements in reliance on the representations and warranties contained therein.

152.    Under Section 5.3 of the Separation and Distribution Agreement, which was the central agreement of the SDA Agreements, Mirra represented and warranted under Section 5.3.1 that the scheduled assets were "all of the assets in which the parties have a joint interest"; and under Section 5.3.2 that the scheduled liabilities "represent all of the liabilities to which the parties are jointly and/or severally liable."

153.    As set forth above, such representations and warranties were false.

154.    Such conduct constituted a material breach of the Separation and Distribution Agreement and of the SDA Agreements.

155.    The conduct of Mirra as set forth herein caused Jordan to sustain damages and was morally culpable and egregious and gross and wanton.

156.    Wherefore, Jordan demands a judgment: excusing her performance under the SDA Agreements on account of Mirra's substantial breach; and for the damages sustained by her on account of such breach.

## COUNT VI
## Claim For Unjust Enrichment

157.    Jordan repeats and realleges the allegations of paragraphs 1 through 156 as if fully stated herein.

158.    As a result of the conduct of Mirra and his agents and co-conspirators as set forth herein, Mirra has and will continue to be unjustly enriched by the rights given and interests conveyed to Mirra under the inherently unfair SDA Agreements.

159.    Wherefore, Jordan demands judgment that Mirra be required to disgorge all rights unjustly given up and interests conveyed by Jordan to Mirra under the inherently unfair SDA Agreements.

## COUNT VII
## Claim For Negligent Misrepresentation

160.    Jordan repeats and realleges the allegations of paragraphs 1 through 159 as if fully stated herein.

161.    Mirra and his agents and co-conspirators, as fiduciaries to Jordan, had a duty to Jordan to give correct information in the SDA Agreements negotiations.

46

162.    Mirra and his agents and co-conspirators made false representations they knew or should have known were incorrect.

163.    The information supplied in such representations were known by Mirra and his agents and co-conspirators to be desired by Jordan for the purpose of determining whether to enter into the SDA Agreements, Jordan intended to rely and act upon such representations, and Jordan reasonably relied on such representations to her detriment by entering into the inherently unfair SDA Agreements.

164.    Such conduct constitutes negligent misrepresentation.

165.    Wherefore, Jordan demands judgment that the SDA Agreements be nullified and that she be awarded such damages she has suffered on account of such negligent misrepresentations.

**COUNT VIII**
**Piercing The Corporate Veil Of RAM Capital And RAM Realty**

166.    Jordan repeats and realleges the allegations of paragraphs 1 through 165 as if fully stated herein.

167.    As set forth herein, Mirra exercised complete control and domination of RAM Capital and RAM Realty, effectively dictating all actions taken by these companies, at all times material hereto.

168.    Such control and domination was used by Mirra to perpetrate frauds and wrongs against Jordan by the forgeries, concealment, fraud, fraudulent inducement, misrepresentations and other misconduct set forth above undertaken by the RAM Capital and RAM Realty professionals and other employees on Mirra's behalf and at his bidding.

169.    Mirra's misuse of his control and domination resulted in injury to Jordan.

47

170.     Wherefore, Jordan demands judgment that the Court "pierce the veil" of RAM Capital and RAM Realty in finding that Troilo, Tropiano, Kolleda, and the other professionals and employees of RAM Capital and RAM Realty be found to have acted as the agents of Mirra with respect to their misconduct as set forth above.

## COUNT IX
## Civil Conspiracy

171.     Jordan repeats and realleges the allegations of paragraphs 1 through 170 as if fully stated herein.

172.     Mirra knowingly and voluntarily acted in concert with Troilo, Tropiano and Kolleda, to engage in forgeries and concealment and fraud, fraudulent inducement, breach of fiduciary duties and other misconduct to conceal from Jordan the amount and extent of her joint holdings with Mirra and then to defraud her and fraudulently induce her in breach of their fiduciary duties, to enter into the SDA Agreements.

173.     By common design or agreement, Mirra and Troilo, Tropiano and Kolleda engaged in such tortious activity in the furtherance of their conspiracy which enabled Mirra to tortiously cause Jordan to give up rights and convey interests to him under the inherently unfair SDA Agreements.

174.     The conduct of Mirra as set forth herein was morally culpable and egregious and gross and wanton.

175.     Wherefore, Jordan demands judgment that Mirra be held liable for the misconduct of Troilo, Tropiano and Kolleda as co-conspirators and the damages caused by such misconduct as set forth above in Counts I through VIII above.

WHEREFORE, the Plaintiff, Gigi Jordan prays that:

(1)     She be granted judgment against the Defendant, Raymond A. Mirra, Jr. as

        set forth in Counts I through IX above.

(2)     She be granted judgment against the Defendant, Raymond A. Mirra, Jr. for

        punitive damages as are permitted by law.

(3)     She be granted such costs, interest and attorneys' fees as are permitted by

        law.

(4)     The Court grant such further relief as is just.

<u>TRIAL BY JURY</u>

The Plaintiff, Gigi Jordan claims a jury trial on all claims so triable.


                              Respectfully submitted,



                              Nathan Z. Dershowitz (NZD-8752)
                              Amy Adelson (AA-4078)
                              DERSHOWITZ, EIGER & ADELSON, P.C.
                              220 Fifth Avenue, Suite 300
                              New York, NY 10001
                              Tel. (212) 889-4009
                              Fax (212) 889-3595
                              ndershowitz@lawdea.com
                              aadelson@lawdea.com

Of Counsel
Kenneth A. Sweder, BBO# 489840
Sweder & Ross LLP
131 Oliver Street
Boston, MA 02110
Tel. (617) 646-4466
Fax (617) 646-4470
ksweder@sweder-ross.com



Dated: March 9, 2012

**Exhibit A**

## EXHIBIT A

### The SDA Agreements

Separation and Distribution Agreement and the Schedules, Exhibits and ancillary agreements attached thereto and referenced therein

Stock Purchase Agreement

Indemnification Agreement

Mutual General Release Agreement

Security Agreement

Assignments and other related documents concerning the transfer of shares of and interests in Biomed America, Inc.; RAM Capital Group, LLC; Valley Creek Estate LLC; RAM Realty Holdings, LLC; Advanced Research Corporation; Cancer Innovations, Inc.; PrideCare, Inc.; and VasGene Therapeutics, Inc.

Deeds and other related documents concerning the transfer of real estate holdings including property located at Trump International Hotel & Tower Condominium, One Central Park West Street, New York, New York; 2230 Camino Del Rosario Drive, Santa Barbara, California; 320 West Street, New York, New York; 272 Ridge Drive, Stateline, Nevada; 2336 Bella Vista Drive, Santa Barbara, California; 201 East Avenue, Clayton, New Jersey; 1494 Tree Line Drive, Malvern, Pennsylvania; and the Stone Ridge Property, Virginia

Documentation required by Merrill Lynch, JP Morgan and Julius Baer to divide assets held in cash and investment accounts

Any and all other documents executed in connection with the Separation and Distribution Agreement